## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**GRETA FAISON,**

        **Plaintiff,**

**v.**                                        **Civil Action No. 07-1447 (RMC)**

**DISTRICT OF COLUMBIA,**

        **Defendant.**

## OPINION

        Greta Faison challenges the failure of the Office of the Attorney General, District of Columbia, to promote her to supervisor of the customer services unit in the Child Support Services Division in July 2005. Ms. Faison alleges that the District discriminated against her because of her age and promoted instead a younger, less qualified candidate, who had been given a special opportunity to qualify. After a bench trial, the parties submitted post-trial briefs. The Court has closely reviewed the transcripts, exhibits, briefs and the entire record and determines that Ms. Faison has not proved that age discrimination played a part in her non-selection. Judgment will be entered in favor of the District of Columbia.

### I.  FINDINGS OF FACT

        Based on the entire record and the credibility of the witnesses, as noted, the Court makes the following findings of fact.

1. In 2005, Greta Faison was employed by the District of Columbia as a Child Support Enforcement Specialist at the DS-11 level in the Office of the Attorney General, Child Support

Services Division ("CSSD"), a position she had held since November 1999.  T1 at 30 (Faison).[1]

At the time in question, July 2005, she was 57 years old, as she was born on March 20, 1948.  *Id.*

at 27.

2.  In June 2005, Ms. Faison applied for the position of Supervisory Management Analyst

("Supervisor") in the customer services unit.  She and another employee, Rocelia Johnson,

interviewed for the position.  T2 at 126 (Johnson).  Ms. Johnson, who was in her mid-30s, had

been serving as acting Supervisory Management Analyst ("Acting Supervisor") for nearly one

year.  *Id.* at 115, 122-23.

3.  Ultimately, Ms. Johnson was selected for the position as Supervisor of the customer services

unit, which led to this suit.

**A.  Child Support Services Division**

4.  CSSD "helps a person caring for a child to get child support from a noncustodial parent."

http://cssd.dc.gov/page/about-cssd (last visited Sept. 26, 2012).  It is part of the District of

Columbia's implementation of the federal child support program established at 42 U.S.C.

§§ 601-687 (Social Security Act, chapter 7, subchapter IV).  Part D of Subchapter IV (referred to

in testimony as "Title IV D") provides for block grants to the states for child support and

establishment of paternity; it is administered and regulated by the Social Security

Administration, Office of Child Support Enforcement.  42 U.S.C. §§ 651-699b.  The federal

Office of Child Support Enforcement was established in 1975; every jurisdiction must designate

a subchapter IV part D director.  T3 at 34 (Rice).  Originally, CSSD was part of D.C.'s

---

[1] Citations to the trial transcript are designated as:  T1 – Transcript of Aug. 29, 2011; T2 –
Transcript of Aug. 30, 2011; T3 – Transcript of Aug. 31, 2011; and T4 – Transcript of Sept. 1,
2011, together with the page number and witness last name.

Department of Human Services, but it was transferred to the Office of the Corporation Counsel (now D.C.'s Attorney General) by former Mayor Anthony Williams in 1999. *See id.* The customer services unit, where Ms. Faison worked, conducts interviews by phone to determine the child support needs of the caller and then directs the caller to the unit within CSSD that can provide assistance. T1 at 17, 34-35 (Rice).

5. In 2004, the customer services unit was one of several units within the Child Support Services Division that included a locate unit "which did investigative work, located the missing parent . . . ," T1 at 37 (Faison); an "interstate unit which did reciprocal work with other states," *id.*; an "intake unit" which took information to establish whether a child custodian needed an order of child support or enforcement of an order through the "litigation unit," *id.* at 38; an "establishment unit" which worked to establish rights to child support and the non-custodial parent's obligation to pay, *id.* at 38-39; and various support units such as quality assurance, information technology, and audit and program management, *id.* at 40. Each unit was headed by a person titled Supervisory Management Analyst, who was the first-line supervisor. *Id.* at 41.

6. Ms. Faison testified that customer service representatives "had to know exactly what each unit did . . . because we would delegate referrals to them once we interviewed the customer and determined the need. If it fell in their unit, then we would send a referral to them . . . ." T1 at 34 (Faison).

7. If a customer service representative did not know the answer to a caller's question, she could turn to the unit's lead tech or, as a last resort, ask the Supervisor of the unit. T1 at 35-37 (Faison).

8.  The customer service representatives needed to "have a supervisor available to us almost at all times" because when a lead tech could not handle a call – such as with an irate customer – it would be transferred immediately to the Supervisor.  T1 at 37 (Faison).

9.  Ms. Benidia Rice was 44 when she became director of CSSD in September 2003;[2] she had not previously worked for the District government.  T2 at 151 (Rice).  Before she came to the District of Columbia, she had been director of the child support services program for the State of Arizona.  *Id*. at 152.  Ms. Rice hired June Mickens as the deputy director in December 2003.  *Id*. at 154.[3]  Both Ms. Rice and Ms. Mickens are attorneys; Ms. Rice holds a dual role as Deputy Attorney General and Director of Child Support Services Division.  T3 at 34 (Rice).

10.  Quentin Manson was the Supervisor of the customer services unit until his retirement in 2004.  T1 at 50 (Faison).  He supervised 10-11 support specialists in the customer services unit, with the assistance of one clerk.  *Id*. at 52.  The unit's lead tech, Deborah Deal (mid-fifties), transferred to another unit just before Mr. Manson retired.  *Id*. at 53-54.  It was Mr. Manson's position for which both Ms. Faison and Ms. Johnson applied.  The position was in the Management Supervisory Service (MSS), both when held by Mr. Manson and when the vacancy announcement was posted.  T3 at 6 (Rice).

**B. Greta Faison's Background and Government Service**

11.  Ms. Faison is a graduate of North Carolina Central University in Durham, North Carolina, class of 1970.  T1 at 28 (Faison); *see also* Pl.'s Ex. 21.

---

[2] Ms. Rice's date of birth is September 12, 1959.

[3] Ms. Mickens remained as deputy director until March 2005.  Within a few months thereafter, she was replaced by attorney Cheryl Zeigler, who was already a CSSD employee.  T2 at 171-72 (Rice).

12. She worked as an operator with the telephone company in North Carolina until she was promoted into advertising and worked as an account executive telephonically selling advertising in the yellow pages before moving to advertising in military newspapers.  T1 at 30-31 (Faison). After approximately 20 years, Ms. Faison moved to Washington, D.C. and continued with the telephone company as a sales trainer, "teaching people how to sell over the phone."  *Id.* at 31.

13. She also worked for about five years for the Washington Star, a former D.C. daily newspaper. T1 at 31 (Faison).  She was a manager in circulation, again working as a sales trainer.  *Id.*

14. Ms. Faison joined the D.C. government on November 8, 1999, in the customer services unit, CSSD, at grade 7.  She testified that "[i]t took years and years and years to really get competent in customer service" and that "[I] probably was the only one that I know of who actually finished the training under our team leader [Deborah Deal], . . . because it was so in depth."  T1 at 35 (Faison).

15. Over the years, Ms. Faison was promoted to grade DS-9 and in 2002 to grade DS-11.  T1 at 41-42 (Faison).  "The DS-11 requires a much higher level of performance and requires that you know most of the issues and answers to the questions of customer service."  *Id.* at 42.  Customer service representatives at the DS-11 grade are authorized to answer questions for lower-level employees and "to [do] minimal training . . . ."  *Id.*

16. Ms. Faison was evaluated during her tenure with the customer services unit and received outstanding and excellent reviews before 2004.  T1 at 45-46 (Faison).  She received two commendations from the Mayor's Office for outstanding work.  In August 2005, after Ms. Rice had become CSSD Director and Ms. Johnson had become Acting Supervisor of the customer services unit, Ms. Faison received a letter from Attorney General Robert Spagnoletti congratulating her on her excellent performance.  Pl.'s Ex. 11; *see* T1 at 49 (Faison) (Ms. Faison

received the letter because Acting Supervisor Rocelia Johnson had commended Ms. Faison on her job performance).

### C.  Ms. Johnson's Background and Experience

17. Rocelia Johnson, who was born on January 8, 1968, was 37 years old in July 2005.  T2 at 115 (Johnson).  She is twenty years younger than Ms. Faison.  Ms. Johnson received a college degree in mathematics from Dillard University in New Orleans, Louisiana, in 1990, and she pursued a graduate degree at Howard University in 1991 but had to drop out because of financial issues.  *Id*. at 131.

18. Ms. Johnson first worked for CSSD in 1992, starting as a temporary employee and clerk in the Interstate Unit.  T2 at 116 (Johnson).  She became a permanent employee in 1994 at grade DS-7.  *Id.*  In July 1999, Ms. Johnson became a DS-11 support specialist[4] in the audit and program management unit, formerly known as the distribution unit.  *Id*. at 118-121.  Herb Jeter was the supervisor of the audit and program management unit.  *Id.* at 135.

19. Ms. Johnson was the lead tech in the audit and program management unit, a position similar to that of Deborah Deal (lead tech for the customer services unit), when Mr. Manson retired in 2004.  T2 at 122 (Johnson).  In this position she performed some supervisory duties, such as approving leave.  *Id.*

20. Ms. Johnson was asked by June Mickens to take the position as Acting Supervisor to replace Mr. Manson temporarily.  T2 at 123 (Johnson).  She received less than a week of training with Mr. Manson.  *Id.*

---

[4]  Ms. Faison was also a DS-11 support enforcement specialist, but she was in a different unit -- customer service.

**D.  Selection of Acting Supervisor**

21. The retirement of Mr. Manson in 2004 created the need for an Acting Supervisor while the
    position was advertised and filled.   To replace Mr. Manson temporarily until the position could
    be filled, Ms. Mickens identified the following as possible interim supervisors:  (1) Deborah
    Deal, lead tech in the customer services unit; (2) Earlean Davis, an employee in the customer
    services unit; and (3) Ms. Johnson, lead tech in the audit and program management unit.  T3 at
    35 (Rice).  At that time, each of these candidates was in her mid-40s.  *Id*. at 35.  Both Ms. Deal
    and Ms. Davis declined the opportunity when it was offered.  *Id*. at 36.

22. When Ms. Deal and Ms. Davis declined, Ms. Mickens recommended that Ms. Johnson serve as
    Acting Supervisor, and Ms. Rice approved.  T2 at 154 (Rice).  Ms. Mickens told Ms. Rice that
    she thought Ms. Johnson would be "a good person for the position based on her status of having
    worked in more than one division.  That she had training experience, and was really viewed as a
    super star in the office with regard to her work and her productivity and quality."  *Id*. at 155.

23. Ms. Johnson assumed the position as Acting Supervisor in the customer services unit in August
    2004.  Pl.'s Ex. 2.

24. Ms. Johnson's selection as Acting Supervisor in the customer services unit became known and
    obvious only when she was observed being trained by Mr. Manson prior to his departure; there
    was no posting of a position as Acting Supervisor.  T1 at 52 (Faison).

25. As Acting Supervisor of the customer services unit, Ms. Johnson reported directly to section
    chief Jennifer Longmeyer-Wood who, in turn, reported to deputy director June Mickens.  T3 at 2-
    3, 8-9 (Rice).

26. Ms. Faison insisted that Ms. Johnson had not worked on the unit and that she did not have the knowledge to be Supervisor.  T2 at 48-49 (Faison).  However, Ms. Faison later conceded that "experience in CSSD was not necessary for the position because CSSD opened the position to external candidates in December 2004 to find someone with call center experience."  Reply [Dkt. 70] at 3; *see also* T3 at 9 (Rice).

27. Ms. Faison complained "that [Ms. Johnson] had no knowledge to bring to the customer services unit.  That was my dispute that she didn't know customer service and she still doesn't."  T2 at 47-49.  But Ms. Faison did not know until trial that Ms. Deal had turned down the position first. *Id.* at 46-47.  Ms. Faison also did not know of Ms. Johnson's college degree, years in CSSD, work in various units in CSSD, or position as lead tech in the audit and program management unit under Herb Jeter.  *Id.* at 46-49.

28. Ms. Faison never spoke to Ms. Rice about the opportunity to work temporarily in Mr. Manson's job but she "felt [she] was clearly denied an opportunity to perform and help the unit in a better way than what I was doing at that particular time.  And I just felt like it wasn't fair."  T1 at 55 (Faison).

29. To the observation of Ms. Faison, Ms. Johnson did not know enough to answer customer questions, which became a problem when Ms. Johnson stopped answering her phone, resulting in many complaints.  T1 at 56-57 (Faison).  Ms. Faison also estimated that the customer services unit received "on the average a thousand to two to three thousand [calls] a day."  *Id.* at 57.  The Court concludes that this number of average calls was exaggerated, *see* T3 at 18-19 (Ms. Rice), and also discounts the testimony about the degree of ignorance demonstrated by Ms. Johnson.

Ms. Faison was an interested witness who cares for her job and doing it right but who also was not entirely credible in her testimony.[5]

30. Ms. Faison also complained about Ms. Johnson's failures to train people properly as Acting Supervisor. T1 at 59 (Faison); T2 at 56 (Faison). Yvette Marbury-Long, a discharged customer service representative called by Ms. Faison as a witness, echoed these complaints. T3 at 131-33 (Marbury-Long). However, neither Ms. Faison nor Ms. Marbury-Long ever complained to anyone in management about Ms. Johnson's alleged failures as a Acting Supervisor; instead, each of them may have spoken to the union president. T2 at 41-42 (Faison); T3 at 134 (Marbury-Long).

---

[5] Ms. Faison had a tendency to exaggerate when it might help her cause. After a debate with counsel for the District of Columbia, she agreed that a person coming into CSSD from "off the street" would require more training than a person who had worked in the agency for years. T2 at 54 (Faison). After testifying that Mr. Manson was on the telephone all day, she retreated and agreed that he took only "some of the calls." *Id.* at 55. She insisted that customer service representatives sometimes talked with customers face to face, *id.*, but then said that she did "[n]ot [talk] face to face, but we were talking voice to voice I guess you would say over the phone." T2 at 58. She testified that Mr. Hailey was in his 30s in 2005, but faced with the fact that he was in his 50s in 2011, she responded:

> Well, if he's in his fifties and now he was probably, I mean, you have to calculate when he left and also I'm not really sure, but in comparison I don't know in what context I was making the statement and if I was saying comparing him to somebody else and there was a significant age difference, then I would be justified in saying it, so *I don't even know*, you know.

*Id.* at 64-65 (emphasis added). As a final example, the Court notes Ms. Faison's careful distinction between her testimony that Herb Jeter (mid-50s) was "taken out of" his position as unit supervisor in audit and management and replaced with Carolyn Walker, a younger person, and the fact, admitted on cross examination, that Mr. Jeter was *promoted* to section chief. *Id.* at 68. Testifying to what she did not even know, or failing to mention what she did know that was contrary to her discrimination thesis, infected Ms. Faison's testimony, causing the Court to discount much of it.

31. Doris Allen, a personnel management specialist in the D.C. Office of Human Rights in 2004-05,

    also testified. OHR serves all city agencies for personnel recruitment. Ms. Allen testified that "an

    employee can be reassigned, detailed or promoted into a temporary position not to exceed 120

    days," as an exception to the Merit Staffing Plan.  T3 at 70 (D. Allen).  The initial 3-month

    period can be extended for another 120 days, but over 240 days an interim assignment "has to be

    approved by the director of the D.C. Office of Personnel."  *Id.*  However, when asked whether an

    employee can remain in a position without obtaining permission or an exception, Ms. Allen

    added, "I can't say." *Id.* at 75.  Later, asked by the Court if an agency could just continue an

    employee in an "acting" capacity beyond 240 days if the agency did not notify Human

    Resources, she responded, "That's for sure." *Id.* at 93-94.

32. Ms. Johnson remained Acting Supervisor of the customer services unit from August 2004 to

    August 2005, without any formal extension of her assignment to the position.


    **E.  Selection of the New Supervisor**

33. Ms. Allen handled the posting of a vacancy announcement in December 2004 that sought

    candidates to fill Mr. Manson's position as Supervisor of the customer services unit.  T3 at 76-77

    (D. Allen).

34.  The vacancy announcement was posted for two weeks in December 2004 and was open to the

    public.  T3 at 8-9 (Rice); Pl's Ex. 5.  The vacancy announcement required all candidates to have

    at least one year of specialized experience.  Ms. Faison interpreted this to mean at least one year

    of child support enforcement experience, associated with some customer service experience.  *Id.*

    at 12-14.  Ms. Rice explained, however, that the requirement was broader.  "If you are in intake,

you do customer service work.  If you are in enforcement, you do customer service work.  If you

are in audit and program management, you do customer service work."  T3 at 15 (Rice).

35. Ms. Faison, but not Ms. Johnson, submitted an application for the position.  T1 at 63 (Faison);

T2 at 125 (Johnson).

36. However, the position as Supervisor of the customer services unit was not filled after the 2004

announcement.  T3 at 17 (Rice).  Ms. Rice could not remember the reasons the vacancy

announcement was cancelled and the job remained unfilled but she knew it was "a low priority

position" because the agency was facing other emergencies.  *Id.* She explained:

> [I]n 2003 when I was brought on board the agency was in a critical status.  We were facing penalties in the millions of dollars from [the] federal Government.  We had failed audits . . . three years in a row and we were being penalized against the Districts TANF[6] Block Grant.  Our data had been deemed unreliable and we weren't meeting performance measures.
> And our goal at that time, the reason I was hired[,] was to move us out of low performance and penalties.  We made some critical decisions of where we were going to put our resources and time and customer service really was not where we were going at that time.
> Our mission was to clean up the data and to get the performance measures up.  Customer service was kind of on the back burner until later on in my tenure in the office.

*Id.* at 17-18.

37. Doris Allen in OHR concluded that Ms. Faison had "no direct related experience to the position

being filled" in connection with the 2004 vacancy announcement.  Pl.'s Ex. 18; T3 at 80 (D.

Allen).  This meant that "the position required one year of specialized experience and evidently

she did not indicate that in her application."  T3 at 81 (D. Allen).  A person who lacked

specialized experience was considered "not even qualified."  *Id*. at 83.  Thus, Ms. Faison's name

was never sent to CSSD as a qualified candidate in response to the 2004 vacancy announcement.

---

[6] TANF stands for Temporay Assistance for Needy Families and is part of the Admistration for Children and Families at the Detpartment of Health and Human Services.

The cancellation of the December 2004 vacancy announcement may mean that no candidate was identified for agency consideration, but this point is not clear in the record.

38. Ms. Faison was notified that she had not qualified for the job.  T1 at 68 (Faison) ("I received a notice from personnel saying that I was not being considered because I did not have any direct experience in the position.").  *See also* Pl.'s Ex. 18.  She protested to Ms. Allen, but she also acknowledged that she may not have fully described her experience in her 2004 application.  T1 at 63 (Faison).

39. Ms. Allen explained that a candidate might be considered not qualified on one application and qualified on the next because "they might be doing the job and just don't know how to fill out the application.  The next time when they apply, they will qualify simply because they have put the duties in the application . . . ."  T3 at 91 (D. Allen).

40. The job opening for the position as Supervisor of the customer services unit was re-posted on June 7, 2005.  T1 at 72-3 (Faison); T3 at 20 (Rice); Pl's Ex. 6.  Ms. Longmeyer-Doyle, as manager over the Supervisor of the customer services unit,[7] handled the arrangements to fill Mr. Manson's former position.  T2 at 174 (Rice).  This time the vacancy opening was limited to CSSD candidates and, as was customary, remained open only for one week, June 7–June 14, 2005.  T3 at 84 (D. Allen); Pl.'s Ex. 6.  Ms. Allen handled the posting and prepared the list of qualified candidates.[8]  The dates for posting the announcement were decided by OHR.  T2 at 173 (Rice); T3 at 84 (D. Allen).

---

[7] In 2004, Jennifer Longmeyer-Wood became program operations section chief, reporting to Ms. Mickens and directly managing the Customer Services Unit.  Glenna Ellis was the assistant section chief under Ms. Longmeyer-Wood.  T2 at 169-170 (Rice).  Ms. Ellis had been an attorney in the Prince George's County child support office before she joined CSSD.  *Id*. at 170.

[8] Ms. Allen was an impressive witness: clear, succinct and knowledgeable.

41. When she testified in 2011, Ms. Rice had no recollection of the re-posting, its timing, why it was

    not open to the public, or which person on her staff actually handled the posting.  T3 at 20-26

    (Rice).  Ms. Faison applied for the position and this time submitted a more thorough application.

    *Id.* at 27.  Ms. Johnson also applied.  T2 at 125-26 (Johnson).  Both women were listed by Ms.

    Allen on the certificate identifying qualified candidates.

42. With more than one qualified candidate, a selection panel of four persons was convened to

    interview the candidates for the position of Supervisor:   Michael Hailey, chief administrative

    officer (age 48); Joseph Allen, supervisory information technology specialist (age 38); Richard

    Catalon, chief of information technology (age unknown); and Glenna Ellis, assistant chief of

    program operations (age mid 40s).  T3 at 101-03 (J. Allen); T2 at 7-8 (Faison).

43. Mr. Hailey was CSSD's chief administrative officer, to whom OHR (among other functions)

    reported, at the time of the 2005 selection.[9]  As the senior executive, Mr. Hailey was coordinator

    for the panel.  He gave each member resumes for the candidates, a position description, and a list

    of questions for each candidate.  T3 at 104-05 (J. Allen).  Ms. Longmeyer-Wood, the section

    chief to whom the new Supervisor would report, drew up the questions.  T4 at 60 (Hailey).  Mr.

    Hailey began each interview and then the members of the panel asked in turn a question from the

    list.  *Id.*; *see* Pl.'s Ex. 7 (interview notes for both candidates).

44. Each candidate was asked the "same exact questions" during the interviews.  T3 at 117 (J.

    Allen).  The last question asked each candidate whether she wanted to add anything to her

    interview.  Pl.'s Ex. 7.  Ms. Faison was interviewed first.  T2 at 7 (Rice).

45. Ms. Faison's interview lasted for approximately two hours.  T2 at 9 (Faison).  She thought she

    had done "very well."  Ms. Faison testified, "I answered all of the questions I thought.  I may

_____

[9] At the time of trial in 2011, Mr. Hailey worked as an Assistant United States Attorney in the
U.S. Attorney's Office, D.C., supervising the witness security section.  T4 at 62 (Hailey).

have stumbled through one, but most of the questions I was very thorough and had knowledge and was able to speak in depth on." T2 at 12 (Faison).

46. In Mr. Allen's judgment, "Ms. Faison was a little less articulate about processes and procedures as in regards to child support, much more in a vague sense." T3 at 118 (J. Allen). To a question about personal qualities that would contribute to the position, Ms. Faison "talked about being a Christian and basically that she believed in doing the right thing." *Id.* At trial in 2011, Mr. Allen had no present recollection of Ms. Faison's interview and read from his contemporaneous notes, *see* Pl.'s Ex. 7, when answering questions. T3 at 119 (J. Allen).

47. Without looking at his notes, Mr. Allen remembered that Ms. Johnson was "enthusiastic about the interview" and that she talked about systems issues and the federal certification process, important to him and the agency as CSSD improved its standing with SSA. T3 at 119 (J. Allen).

48. Mr. Allen had no conversations with Ms. Rice about the selection process prior to the interviews and, since he had only been with CSSD for six months, considered himself "truly an outsider for the position and the panel." T3 at 122 (J. Allen).[10]

49. Mr. Hailey "felt that Ms. Faison wasn't focused when asked particular questions and her responses to me were long winded and again, not focused in that way. I thought she was too talkative." T4 at 52 (Hailey).

50. Asked specifically about her prior experience, Ms. Faison "wasn't focused in a way that . . . gave me as a panelist the impression that she was well, answering the question essentially." T4 at 53 (Hailey).

51. The panel gave no weight to Ms. Faison's age and Mr. Hailey did not know her age or Ms. Johnson's age. T4 at 53 & 61 (Hailey).

---

[10] Since 2005, Mr. Allen has been promoted to chief of information technology for CSSD.

52. As Mr. Hailey remembers, the panel members "all agreed that [Ms. Faison] was not focused . . . , she was distracted, easily distracted.  There were questions that were asked where the responses had more to do with what I felt more her religious beliefs than the actual question that was asked. . . . [She was] not really giving a substantive answer to some of the questions that were asked." T4 at 57 (Hailey).

53. In comparison, in reviewing his contemporaneous notes on Ms. Johnson's interview, Mr. Hailey testified, "what leaps out at me is the fact that all of the responses have to do with skill of some sort or the, certainly w[ere] focused in a way that answered the question.  So that it was on point, it had to do with the individual's ability to serve in the capacity . . . that we were seeking."  T4 at 58 (Hailey).

54. With the better interview behind her, "[t]he panelists all agreed that Ms. Johnson had the better skills, skill set to manage that particular job."  T4 at 60 (Hailey).

55. Ms. Faison learned that she was not selected when "Benidia Rice asked me to come to her office . . . and she told me that the panel had decided and they thought that Rocelia Johnson was more knowledgeable and they had given her the position."  T2 at 13 (Faison).

56. Ms. Faison testified that she told Ms. Rice that she could not work under Ms. Johnson[11] and wanted to transfer to another CSSD unit, suggesting she was interested in either the quality

---

[11] The complications for Ms. Faison working for Ms. Johnson were personal as well as professional.  As Ms. Faison testified:

> Q.  Ms. Johnson became your permanent supervisor after she was selected for the position, correct?
> A.  Correct.
> Q.  And you would agree that your attitude towards Ms. Johnson changed at that time?
> A.  It could have.  I don't know.  I didn't interface a lot with her, never did.
> Q.  Now, you know Ms. Johnson outside of work, don't you?

assurance or intake units.  T2 at 17 (Faison).  Ms. Rice checked with both units and later told Ms.

Faison that there were no openings in either.[12]  *Id*. at 17-19.

57. Changes that Ms. Johnson made to the job duties of the employees in the customer services unit

led to a union grievance, which was resolved by allowing the employees to transfer to selected

units.  T2 at 19 (Faison).  As a result, Ms. Faison now works in the audit and program

management unit.  *Id.* at 20.


**F.  Alleged Discrimination Against Age-Protected Employees**

58. No one ever made a comment to Ms. Faison about her age.  However, she testified, "I just know

how [Ms. Rice] interfaces with me.  She doesn't take me to lunch.  I mean, I'm not in the age

groups that she goes to lunch with."  T2 at 94 (Faison).

59. Linda Colter, who worked at CSSD until her discharge in 2006, also complained that Ms. Rice

"was taking the younger workers out to lunch with her . . . [t]he ones that became managers all of

a sudden . . . Rocelia Johnson, Aggie Rhodes and Carolyn Walker."  T2 at 105 (Colter).  Ms.

Colter's bias was evident, arising from the fact that she was one of a number of CSSD employees

---

A.  She knew me outside of work.
Q.  You attend her church, correct?
A.  No, she attends my church.  I have been in that church since I
was two years old.
Q.  So you all attend church together?
A.  She came in I think the '70s.  I have been in that church since
1950 something.
Q.  So you all attend the same church?
A.  Yes, it's my family church.  She married into the church.

T2 at 71 (Faison).

[12] Ms. Faison testified that she was "humiliated and embarrassed," T2 at 18 (Faison), by the
public way and language by which Ms. Rice told her that there was no vacancy in the intake unit.
The Court draws no conclusions from this testimony as the reported event occurred after the
selection in question and Ms. Faison's testimony on such matters was not fully creditable.

who were suddenly reviewed at six-month intervals, instead of annually, and terminated for poor performance after Ms. Rice became director. *Id*. at 104-07; T4 at 6, 10 (Thomas). Due to such bias, the Court gives no weight to Ms. Colter's observations.

60. In contrast, Ms. Rice testified that she brings her lunch to work with her at least three days a week and eats in the lunchroom on the fifth floor that is open to all CSSD employees. T3 at 37 (Rice). On this record, the evidence that Ms. Rice sometimes lunches with supervisors she has hired or selected, rather than employee specialists in CSSD, is not demonstrative of age discrimination against Ms. Faison.

61. More significantly, Ms. Faison advanced the argument that CSSD under Ms. Rice replaced older employees with younger ones in a discriminatory fashion because of their age. The evidence presented to support the argument was based entirely upon Ms. Faison's estimates of employee ages. *See* T2 at 64-65 (Faison) (explaining her mistaken assertion that Mr. Hailey was in his thirties in July 2005 when he was actually 48 at the time: "I said I believe he's in his thirties. . . . I think we all do that, don't we? We sort of guesstimate, look at the lines or whatever and, you know, sometimes [project]. But I know most of the information I know about the age, so if he's one that is in the protected class, then so be it."); *id*. at 90 ("But, you know, when you work around people you have some idea of what age they are, what age category they're in. . . . I don't know their birth dates, no. And that would be the only way I would know how old they are.").

62. At an unknown time between June 2005, when the vacancy announcement was posted a second time, and August 2011, when the case was tried, the organization of CSSD was changed. To identify employees and their estimated ages, the Court will use the new organizational structure. Ms. Rice (mid-50s) continued as director with Cory Chandler (37) as her deputy director. Also,

there are four section chiefs:  Joseph Allen (38), systems and automation; Herb Jeter (early-50s), fiscal operations; Nancy Johnson (mid-40s), litigation; and Tanya Jones-Bosier (late 30s), policy and outreach.  There are also nine unit supervisors (now called "unit chiefs"):  six are over 40 (Deborah Haynes-Reston, Pat Williams, Margaret Price, Jeffrey Jackson, Richard Cooper and William Pinkett) and three are younger than 40 (Aggie Rhodes, Artish Fountain and Carolyn Walker).  Ms. Johnson is no longer a unit supervisor.[13]

63. Ms. Rice testified that "at least 50 percent of the managers that have been hired [since she became CSSD Director] have been over the age of 40," T3 at 38 (Rice), including her two deputies, June Mickens and Cheryl Ziegler;  Rick Cooper, state distribution manager; Karen Debalera and Jeffrey Jackson, both hired to supervise the locate unit; Curtis Dailey, assistant section chief for legal; Deborah Haynes-Reston, support staff supervisor in litigation unit; Herb Jeter, promoted from unit chief to fiscal operations section chief; William Picknett, unit chief, service unit; Angela Harvey Thornton, unit chief, community outreach; Tim Thomas, Roger Turpin, Yvette Jordan and Eugenie Lucas, supervisory case management specialists; and Robert Bond and Margaret Price, records manager at different times.  *Id*. at 38-41.  Ages of these personnel ranged from early 40s to early 60s upon hire or promotion.  *Id.* at 39-41.  She also hired younger persons.  *Id.* at 43-50.

## II.  LEGAL STANDARDS

The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34, prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623. To prevail on an ADEA claim, a plaintiff must show (1) that she is a member of the protected

---

[13] Ms. Johnson has been a supervisory program analyst in the data reliability unit since 2008.  T2 at 133, 135 (Johnson).

class (*i.e.*, over 40 years old); (2) she was qualified for the position for which she applied; (3) she was not hired; and (4) she was disadvantaged in favor of a younger person. *Teneyck v. Omni Shoram Hotel*, 365 F.3d 1139, 1155 (D.C. Cir. 2004).

The ADEA applies to the District of Columbia. *See* 29 U.S.C. § 630(b) (defining "employer" to include States) and § 630(i) (defining "State" to include the District of Columbia). Further, as amended in 1974, the ADEA applies "in those units in the government of the District of Columbia having positions in the competitive service," and extends the prohibitions against age discrimination in the federal government to such D.C. employees. *Id*. § 633a(a). The parties do not dispute that Ms. Faison held (and holds) a position in the competitive service and that this case is covered by § 633a(a).

A plaintiff can establish liability under the ADEA in two ways. First, a plaintiff can use "the *McDonnell Douglas* evidentiary framework to establish that age was the 'but-for' cause of the challenged personnel action." *Ford v. Mabus*, 629 F.3d 198, 207 (D.C. Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Barnette v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006) (*McDonnell Douglas* applies to ADEA claim). Second, a federal employee "may also establish liability, though not necessarily entitlement to such remedies as reinstatement and backpay, by showing that age was *a* factor in the challenged personnel action." *Id.; cf. Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009) (recovery limited to proof of "but for" discrimination under ADEA in a case with a non-federal plaintiff).

Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff is successful (*i.e.*, she has shown she is a member of a protected class, suffered an adverse action, and the circumstances give rise to an inference of discrimination), the burden of production shifts to the

employer to articulate a legitimate, non-discriminatory reason for its conduct. *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (the employee "may succeed in this either directly by persuading the Court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation  is unworthy of credence."). If the employer meets its burden of production, "the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual." *Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993).

Recently, however, the D.C. Circuit has stated that whether a plaintiff has made out a prima facie case is "almost always irrelevant" and "is a largely unnecessary sideshow." *Brady v. Office of the Sgt. at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008).  Instead, when "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not — and should not — decide whether plaintiff actually made out a prima facie case under *McDonnell Douglas.*" *Id*. at 494 (emphasis in original).  The district court immediately proceeds to the ultimate issue of discrimination:  "has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee [on a prohibited basis]?" *Id*.  In answering this ultimate question, the prima facie case remains relevant, but only as part of the evidence the court considers.  *See Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009) ("[T]he court reviews each of the three relevant categories of evidence — prima facie, pretext, and any other  — to determine whether they 'either separately or in combination' provide sufficient

evidence for a reasonable jury to infer [discrimination or] retaliation.") (citing *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002)).

Although the intermediate evidentiary burden shifts back and forth under the *McDonnell Douglas* framework, the ultimate burden of persuasion rests at all times on the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). "Liability depends on whether the protected trait [under the ADEA, age] actually motivated the employer's decision." *Id.* at 141 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). Ms. Faison has the burden of proving that the District's reasons for not selecting her as the Supervisor of the customer services unit were a mere pretext for age discrimination.

## III.  ANALYSIS

A court may not "second-guess an employer's personnel decision absent [a] demonstrably discriminatory motive." *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.3d 94, 100 (D.C. Cir. 1982)); *see also Holcomb v. Powell*, 433 F.3d 897, 889 (D.C. Cir. 2006) (court may not act as a "super-personnel department that reexamines an entity's business decisions." ) (citing *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999)). For example, in *Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 309 (D.D.C. 2005), the court held that the employer stated a legitimate non-discriminatory reason for not selecting the plaintiff, because the plaintiff's application was not as detailed and complete as the other candidates. And in *Stewart v. Ashcroft*, 352 F.3d 422 (D.C. Cir. 2003), an attorney candidate for promotion to DOJ section chief claimed that he had superior trial experience to the candidate who was selected. But the DOJ asserted that management experience was the most critical qualification and the court was compelled to defer to the government's determination regarding which qualification was most important. *Id.* at 429.

In some circumstances, qualifications evidence may show pretext. *Ash v. Tyson Foods, Inc*., 546 U.S. 454 (2006). For example, a factfinder may infer pretext if a reasonable employer would have found the plaintiff to be "significantly" better qualified for the job. *Aka v. Washington Hosp. Ctr*., 156 F.3d 1284, 1294 (D.C. Cir. 1998) (defendant's motion for summary judgment was denied when there was evidence showing that the plaintiff was "markedly" more qualified than the selectee). A court should not reexamine a promotion decision "where it appears the Government was faced with a difficult decision between two qualified candidates, particularly when there is no other evidence" of discrimination. *Barnette*, 453 F.3d at 519.

A plaintiff cannot demonstrate pretext merely based on a subjective assessment of her own performance. *Hammond v. Chao*, 383 F. Supp. 2d 47, 57 (D.D.C. 2005). In determining pretext, it is the perception of the decision-maker that is relevant. *Branson v. Price River Coal Co*., 853 F.2d 768, 772 (10th Cir. 1988); *Morgan v. Vilsack*, 715 F. Supp. 2d 168, 183 (D.D.C. 2010). A court does not focus on whether the reasons offered by the employer were correct but instead evaluates whether the selecting official honestly believed the reasons offered. *Fischbach*, 86 F.3d at 1183; *see Hammond*, 383 F. Supp. 2d at 58 (where a selecting official selects a candidate based on the application and his personal knowledge of the candidates, even if the selecting official's personal knowledge was incorrect, a court should defer to the employer's decision so long as there is no evidence of bad faith).

The District of Columbia concedes that at the relevant time Ms. Faison was a member of the protected class under the ADEA, as she was 57 years old in July 2005. The District also concedes that her nonselection was an adverse action and that the selection of a younger candidate gives rise to an inference of discrimination. Since a *prima facie* case is conceded, the issue is whether the legitimate, nondiscriminatory reasons advanced by the District

of Columbia for its nonselection of Ms. Faison and its selection of Ms. Johnson are untrue or pretextual. The ultimate question here is whether Ms. Faison demonstrated by a preponderance of the evidence that the District failed to select her for as Supervisor of the customer services unit due to age discrimination.

The District argues that Ms. Johnson was more qualified than Ms. Faison, even without her temporary appointment to replace Mr. Manson, and that Ms. Johnson interviewed better than Ms. Faison. Ms. Faison retorts that she was better qualified than Ms. Johnson; that Ms. Johnson was given an unfair advantage through her temporary assignment in the position; that the selection process was highly irregular, suggesting discriminatory motive; and that Ms. Rice gave preferential treatment to younger employees. Notably, Ms. Faison does not contest the selection panel's determination that Ms. Johnson was more impressive in the interview process.

## A.  Non-Selection for the Position as Acting Supervisor

Ms. Faison asserts that she was not selected for the position as Acting Supervisor when Mr. Manson retired because of her age. Although argued as if this were part of her actionable claims, it is not. Ms. Faison made no internal complaint, filed no charge, and did not make this claim in her complaint. *See Hunter v. Rice*, 531 F. Supp. 2d 185, 192 (D.D.C. 2008) (there can be no adverse action from non-selection when an employee fails to apply for vacated position). Further, as evidence of discrimination in Ms. Faison's non selection in July 2005, the circumstances regarding the appointment of Ms. Johnson to the position of Acting Supervisor have little to no evidentiary value.

Ms. Faison discounts Ms. Johnson's prior experience, in multiple units within CSSD since 1992, because Ms. Johnson held only a temporary clerk position on assignment from

a staffing agency before Ms. Johnson became an permanent employee in the interstate unit of CSSD.  Therefore, Ms. Faison contends, Ms. Johnson did not have greater seniority than she. In addition, Ms. Faison argues that her recommendation letter from former supervisor Roscoe Grant spoke to Ms. Faison's "excellent performance and deep knowledge of the customer service unit," traits that are clearly unshared by Ms. Johnson.   Reply at 4.[14]

The Court can find no support, arising from the August 2004 selection of Ms. Johnson as Acting Supervisor, for Ms. Faison's claim of age discrimination in 2005 when she was not selected for the position of Supervisor of the customer services unit.  The parties agree that there was no requirement to post a notice or take applications for the position of Acting Supervisor, that Ms. Faison never asked to be considered or complained about her non-selection, and that management's decision was not contrary to any regulation.  Ms. Johnson was a lead tech in the audit and program management unit and was the third candidate considered for the position of Acting Supervisor.  Those considered before her, and actually offered the position, included Ms. Deal, who was in the protected class and whose superior credentials Ms. Faison does not challenge.

June Mickens, as Deputy Director of CSSD, was tasked with recommending someone to take the Acting Supervisor position when Mr. Manson retired.  T4 at 92 (Mickens).[15] Upon the person's acceptance of the position and Ms. Rice's approval, the Acting Supervisor position would be filled.  Ms. Mickens testified that she was looking for someone "who's going to be able to see the vision of the whole office and to be able to articulate for the members of that

---

[14] Ms. Faison also asserts that Ms. Johnson's performance as Acting Supervisor was deficient. These arguments are not relevant to the earlier decision to appoint her to the position of Acting Supervisor.

[15]  The Court fully credits Ms. Mickens, who testified clearly and openly and who has long since left CSSD and, therefore, has little reason not to be fully candid.

team the part they play in fulfilling that vision." *Id*. at 82.  She added that she needed
"[s]omeone who whether he or she has a title or not is a leader so that the members of the team
are able to count on[,] to go to[,] to really see that person as a model." *Id.*  Ms. Mickens first
identified Deborah Deal, who was lead tech, *id*. at 83, 88, 93, and therefore second-in-command
to Mr. Manson.  Ms. Rice also considered Ms. Deal "the super star in customer service."  T3 at
36 (Rice).  When offered the position, Ms. Deal declined due to health reasons.  *Id*.; T4 at 84
(Mickens).

Ms. Mickens also identified Ms. Johnson, another lead tech, for the Acting
Supervisor position.  Ms. Johnson had worked in CSSD for a number of years; was lead tech in
the audit and program management unit under a particularly exacting manager; had experience
with all the money issues of child support; had been selected to be an official trainer by former
CSSD Director Joe Perry; and was someone whom Ms. Mickens believed could become a
successful as Supervisor in the customer services unit.  T4 at 84-85, 93 (Mickens).  Ms. Mickens
considered all specialists in the customer services unit but she identified no one who stood out
beyond a "very solid and super worker[]," and a "quality staff member[]."  *Id*. at 88.

Ms. Faison argues that the offer of the Acting Supervisor position to Ms. Deal and
the offer to Ms. Johnson could have had separate reasons, so that the latter supports her claim of
illegal age discrimination even if the former does not.  This point is simply not supported in the
record.  Ms. Mickens fully explained her analyses of candidates and her conclusion that no
current employee in the customer services unit qualified as a candidate with "vision."  *Id.*  Ms.
Faison argues that she was not asked about her vision for the customer services unit, but Ms.
Mickens' failure to inquire on that precise point does not suggest discriminatory animus behind
her evaluation of the unit employees or her recommendation of Ms. Johnson, already a lead tech

in her own unit.  Rather, the identification of the ADEA-protected Ms. Deal as the primary candidate and, only on her rejection, the appointment of Ms. Johnson to the Acting Supervisor position completely undercuts Ms. Johnson's temporary assignment as evidence of age discrimination against Ms. Faison.

**B.  Alleged Unfair Advantage Due to Prior Position as Acting Supervisor**

There can be no doubt that Ms. Johnson had an advantage going into the interview process because she had been Acting Supervisor in the customer services unit and knew the issues facing CSSD.  The question posed by Ms. Faison's challenge is whether this advantage was illegal under the ADEA.  Although the argument is closely related to whether there was discriminatory animus against Ms. Faison in the appointment of Ms. Johnson to the job of Acting Supervisor (which the Court has answered in the negative), Ms. Faison's argument in this respect is different:  she relies on the irregular length of Ms. Johnson's "temporary" appointment as proof of age-related bias against her.  Pl.'s Closing Br. [Dkt. 68] at 21 ("The fact that Ms. Johnson continued in the role well after it legally ended conclusively establishes discriminatory motives by the District.").

To support this argument, Ms. Faison relies heavily on Doris Allen's testimony and contends that Ms. Johnson was detailed illegally for more than 120 days to the Acting Supervisor position.  Ms. Johnson's initial appointment was not to exceed 120 days and should have ended on December 21, 2004.  *See* Pl.'s Ex. 2.  As Ms. Faison points out, there is no official form in the record authorizing the continuation of Ms. Johnson's detail for an additional 120 days or any evidence that the D.C. Office of Personnel approved her continuation beyond 240 days.  Ms. Faison argues that "[b]ecause the District has failed to explain why Ms. Johnson was allowed to remain in the position exceeding the legal limit, the Court should question the

credibility of its asserted legitimate non-discriminatory reason for Ms. Faison's non-selection."
Reply at 7.

The Court recognizes that Ms. Johnson's detail continued beyond its original 120 days and that no formalities supported its continuation. As Ms. Allen agreed, the failure of an agency to notify OHR that it was continuing a temporary appointment would mean that there was no accounting for its unapproved duration. T3 at 93-94 (D. Allen). By itself, however, this inaction is immaterial to the complaint of non-selection. The Court can find no evidentiary value to the placement of Ms. Johnson in the acting role, as explained above. The record supports no basis to find that the continuation of Ms. Johnson in the position of Acting Supervisor carries any implication of illegal animus in favor of younger candidates.[16]

## C. Allegedly Tainted Interview Process

The gravamen of Ms. Faison's claim is that she was not selected for promotion to the position as Supervisor in July 2005 because Ms. Rice discriminated against her on the basis of her age. In support of her claim, Ms. Faison alleges that the interview process was tainted with age discrimination. She argues (1) that Ms. Rice informed her that she and Ms. Johnson were equally qualified so that an interview would be necessary; (2) that Ms. Rice misdirected her to go for the interview an hour early, thus interfering with her preparation time; and (3) that the procedures were invalid because (a) the Attorney General did not interview Ms. Johnson; (b) there was no selection certificate; (c) the selection panel consisted of individuals who worked

---

[16] Note that the first time the position as Supervisor was posted was in December 2004, within four months after the appointment of Ms. Johnson as Acting Supervisor. At that time, Ms. Faison's application was insufficient to demonstrate her experience, and Ms. Johnson did not even apply. Perhaps because there were no qualified candidates (at least none on this record), the announcement was cancelled. Had the December 2004 posting been successful, Ms. Johnson's tenure as Acting Supervisor would have been considerably shorter (although more than 120 days).

closely with Ms. Rice; and (d) Ms. Faison was not asked the same questions as Ms. Johnson during the interviews.  The record does not support these arguments as a matter of fact or law.[17]

      First, Ms. Faison's actual testimony was, "I *think* it was Benidia [Rice] who came to me too and said that it appeared that Rocelia and I were equally qualified and the determination wasn't made.  So they would have to use a panel to make the final decision on the position."  T1 at 75 (Faison) (emphasis added).  Ms. Rice recalls only that Ms. Faison came to her and told her that Ms. Faison had applied for the job and "[i]t would have been my general response for any employee to just wish them luck and tell them that the panel of the interviewers would make their decision and it would go to me and then ultimately for management it would go up to the Attorney General."  T2 at 172 (Rice).  Perhaps learning that she and Ms. Johnson were both found to be qualified by OHR was interpreted by Ms. Faison to mean that they were "equally qualified," but the record supports no discriminatory weight to the alleged statement by an unidentified person that both candidates were "equally qualified."

      Second, Ms. Faison acknowledges that Ms. Rice's secretary advised her of the date and 10:00 AM schedule for her interview with the panel days before the interview.  T2 at 5 (Faison) ("I think it was within a week, two to five days . . ., but *it was timely enough for me to prepare*.") (emphasis added).  On the day in question, however, Ms. Rice told her to go to the interview at 9 a.m., which Ms. Faison characterizes as "drastic steps to interfere with [my]

---

[17] Ms. Faison also alleges that she was not formally notified in advance of the date of her interview.  She testified that Ms. Rice's secretary had told her the date and time of the interview about a week earlier, with the comment that Ms. Rice did not want her to know this information, whereas Ms. Johnson was "formally" notified by telephone.  The District of Columbia objected to the testimony about an alleged comment by Ms. Rice as hearsay.  Ms. Faison argues that it is not hearsay because she was repeating a statement of a party opponent.  The Court finds that Ms. Rice's secretary is not a party opponent and that her statement, containing double hearsay about what Ms. Rice might have said, is inadmissible and unreliable.  The testimony is stricken from the record.

interview." Pl. Closing Br. at 23. Ms. Rice has no recollection of this reported conversation. T2 at 180 (Rice). Ms. Rice's direction apparently caused Ms. Faison to interrupt her preparation, go from the fifth to the tenth floor and speak with the receptionist, and return to her desk. Ms. Faison attributes the interruption to her preparation time to age discrimination by Ms. Rice. The Court cannot determine whether this conversation occurred but, assuming that it did, can find so legally-significant malice in it. Instead, the conversation merely reflects human error. In her trial testimony, Ms. Faison admitted that she had time to prepare for her interview. *See id.* at 5.

Third, Ms. Faison argues that the selection procedures were invalid because there was no selection certificate and the Attorney General himself did not interview Ms. Johnson. These arguments raise interesting questions but do not support a finding of age discrimination. Ms. Faison herself notes, contrary to her argument of a flaw in the process, that there is no evidence that it is necessary for the Attorney General to interview candidates for a supervisory position. Reply at 8. The Court agrees. The Court also agrees with Ms. Faison that any confusion in the evidence as to who, ultimately, was the selecting official, is resolved by finding that Ms. Rice, as Director of CSSD, was responsible for the final selection decision upon recommendation from the panel. *See* T2 at 185 (Rice) (testifying that she had authority to reject the recommendation of the interview panel).

Other alleged procedural issues might show carelessness but there is no demonstrated connection in the trial evidence between such issues and Ms. Faison's age, much less her non-selection. The parties debate the significance of Plaintiff's Exhibit 8, a "selection certificate" for the Supervisor position. The exhibit lists the two candidates, Mses. Faison and Johnson, denotes "residential preference ("RP") next to Ms. Johnson's name, and an "S" for "selected" under the "action taken" section. *Id.* Mr. Hailey's signature is in the block for

signature of the designee who conducted the selection interviews. *Id.*; T2 at 188 (Rice). Mr. Hailey said he was *not* the selecting official. T4 at 67 (Hailey); T 3 at 88 (D. Allen) (Mr. Hailey signed the selection certificate as the "designee," that is, the person designated to hold the interview). Ms. Faison argues that the absence of the signature by the selecting official means that *no* selection was made and that Ms. Johnson merely continued in an "acting" capacity.

The paperwork snafu is not relevant to the claim that Ms. Faison was *not* selected and Ms. Johnson *was* selected (or continued) because of Ms. Faison's age. The paperwork question here is not the kind of irregularity in selection which might hide discrimination and, thereby, be potential evidence. While the lack of a properly signed selection certificate might have affected the validity of Ms. Johnson's promotion in August 2005, it does not indicate age discrimination against Ms. Faison. It does not, for example, disturb the fact that the interview panel unanimously recommended Ms. Johnson for the job, a point Ms. Faison does not actually contest.[18]

Ms. Faison also challenges the membership of the interview panel, "composed of Ms. Rice's direct reports and individuals who had worked closely with Ms. Johnson prior to the interview." Pl.'s Closing Br. at 23. She argues that "Ms. Johnson knew all the panel members before she interviewed [because] she had attended meetings with all panelists except Mr. Catalan." *Id.* Putting aside whether "attending meetings" constitutes "working closely," the Court finds no whiff of discriminatory animus in the identities of the interview panelists. The panel was split between persons who knew the work of the customer services unit and those who were more distant; it included two persons relatively new to CSSD (Ms. Ennis and Mr. Allen)

---

[18] The District of Columbia could not explain how a document signed by the head of the interview panel could have sufficed to show a signature by a selecting official, except to suggest that Mr. Hailey was the chief administrative officer to whom OHR reported and OHR might have just acted on his authority.

and senior management outside Ms. Rice's chain of command (Mr. Hailey and Mr. Catalan).
Mr. Hailey, who led the panel, was in the protected class himself while Mr. Catalan's age was
never even estimated.  Other than Ms. Faison's insinuation, there is no evidence to support a
claim that the selection panelists were chosen as agents for Ms. Rice to discriminate against Ms.
Faison.

   The more serious contention by Ms. Faison is that she was not offered the same
opportunity during the interview process to demonstrate her capabilities because she was not
asked the same questions as Ms. Johnson.[19]  In this respect, Ms. Faison notes that Ms. Johnson
was asked during the interview what she was looking for, T4 at 68 (Hailey); that Mr. Hailey did
not recall Ms. Faison being asked that question and it is not recorded in his interview notes, *id.*;
and that Mr. Hailey considered Ms. Faison too talkative, easily distracted, and not focused during
the interview, T4 at 66 (Hailey); Pl. Ex. 7 at 17.[20]  Ms. Faison argues that Mr. Allen testified that
he is unsure whether Ms. Faison were asked if she had management experience, T3 at108 (J.
Allen); Pl. Ex. 7 at 26, a question that was directed to Ms. Johnson.  *See* Pl.'s Closing Br. at 10.
Neither of these questions was on the list of prepared questions directed to both candidates. The
first of these unasked questions appears unimportant and Ms. Faison does not explain why she
thinks it was critical.  A question about management experience may well have been useful, as
Ms. Faison could have expounded on her experience.  However, she has mischaracterized Mr.

---

[19] Different questions to different candidates with different backgrounds and different answers to
prior questions are not *per* se indicative of discrimination.  A plaintiff in an ADEA case has the
burden of proving by a preponderance of the evidence that an employer's asserted non-
discriminatory reason was not the actual reason and that the employer intentionally discriminated
against the employee on a prohibited basis.  *Brady*, 530 F.3d at 494.

[20] Ms. Faison's contention that she lacked focus due to Ms. Rice's interruption to her
preparations, *see* Pl.'s Closing Br. at 12, is undermined by her admission that she had adequate
time to prepare for her interview.  T2 at 5 (Faison).

Allen's testimony.  When asked about his notes, Mr. Allen first said, "I don't believe that was a question that we actually asked [Ms. Johnson]."  T3 at 108 (J. Allen).  Upon re-cross, he was asked about it again:

> Q.  So according to your own notes Ms. Johnson was asked a question that Ms. Faison was not?
>
> A.  No, that's incorrect.  As I mentioned before in previous testimony is that I'm not sure if I put this question in here just to clearly delineate this answer that I had received or just to kind of document from my notes that I had taken.

T3 at 124 (J. Allen).  In other words, Mr. Allen clarified that Ms. Johnson provided information about her management experience in response to a question about something else.

Even assuming that there was this single deviation in the interview questions, it provides very small support, if any, to Ms. Faison's claim of age discrimination as she cannot demonstrate a connection between the unasked question and her age.

**D.  Superior Qualifications**

Ms. Faison contends that she had superior qualifications to Ms. Johnson's and that she would have been promoted if there were not age discrimination.  In addition to her five years of actual work within the customer services unit, Ms. Faison explained that she "had management experience, I had performed outstandingly or excellently in my evaluations, in all of them.  I actually was a team player and worked well with the [U]nit."  T1 at 62 (Faison).

Because courts should not second guess or reexamine promotion and hiring decisions, *see Holcomb*, 433 F.3d at 889, "[a] plaintiff asserting that an employer's explanation is pretextual based upon comparative qualifications faces a formidable task."  *Nyunt v. Tomlinson*, 543 F. Supp. 2d 25, 39 (D.D.C. 2008).  Only a qualifications gap that is "wide and inexplicable" might support an inference of discrimination.  *Lathram v. Snow*, 336 F.3d 1085,

1091 (D.C. Cir. 2003); *see also Aka*, 156 F.3d at 1294 (factfinder may infer pretext if a reasonable employer would have found the plaintiff to be "significantly" better qualified for the job).

As indicated above, Ms. Faison is a college graduate with decades of experience in dealing with people on the telephone. Her recount of her job experience includes a period as "a manager . . . in circulation" at the Washington Star but the function of that job was "teaching new employees how to sell over the phone," and not management of lower-level persons. T1 at 31 (Faison). At the time of the promotion in question, Ms. Faison had been with CSSD for five years, all within the customer services unit, at which she had become quite proficient. Ms. Johnson also has a college degree and had worked in the Child Support Services Division for 12 years at the time of her appointment as Acting Supervisor. Unlike Ms. Faison, Ms. Johnson was a lead tech in her unit. She had worked in the interstate unit, the establishment unit, the distribution unit, and audit and program management unit. She had also served as a trainer for the entire Child Support Services Division.

The differences in experience between the two candidates lean, if at all, in favor of Ms. Johnson's selection. Such differences certainly do not illustrate a wide and inexplicable gap between them in favor of Ms. Faison. Before her stint as Acting Supervisor, Ms. Johnson already had 10-12 years of CSSD experience in a variety of units (depending on whether one counts her temporary clerking position for two years) and had earned a role as lead tech. On top of that, she had experience in the job in question. Ms. Faison's commendable study of the complexities of the customer services unit for five years could have been preferred by the District of Columbia because of her in-unit seniority, but it was not. Reasonable minds could reasonably differ as to which background was the more valuable to CSSD in 2005, but the Court

33

may not second-guess the District of Columbia's promotion decision absent a demonstrably discriminatory motive.  *See Fischbach*, 86 F.3d at 1183.

Without exactly saying so, Ms. Faison also argues that a reasonable factfinder should disbelieve panelists' claims that they relied on an unfavorable impression of Ms. Faison's interview.  To the contrary, "'[a] subjective reason can be legally sufficient, legitimate, and nondiscriminatory if the defendant articulates a clear and reasonably specific factual basis on which it based its subjective opinion.'"  *Pearsall v. Holder*, 610 F. Supp. 2d 87, 101 (D.D.C. 2009) (quoting *Laboy v. O'Neill*, 180 F. Supp. 2d 18, 23 (D.D.C. 2001); *see also Fischbach*, 86 F.3d at 1183 (court should not focus on whether the reasons offered by the employer were correct but instead must determine whether the selecting official honestly believed the reasons offered).  The Court finds that the witnesses here presented fully credible testimony and that the testimony was explained with clear and reasonably specific facts.  There is no basis in the evidence to disbelieve Messrs. Hailey and Allen as to the reasons for the panel's recommendation of Ms. Johnson or Ms. Rice's acceptance of that recommendation.

Each individual point made by Ms. Faison fails when separately examined. Collectively, however, she argues that they paint a discriminatory mosaic:

> First, the District has failed to offer any evidence of a legitimate non-discriminatory reason for Ms. Faison's non-selection.  At most, the evidence shows that the interview panel recommended Ms. Johnson for the position; there is absolutely no evidence that a *selection* actually occurred.  Second, even if the District did meet its burden to articulate a legitimate non-discriminatory reason to rebut Ms. Faison's *prima facie* case, Ms. Faison has shown that this reason is entirely unworthy of credence.  Specifically, Ms. Johnson was preselected for the position because the District gave her an illegal promotion to allow her to train in the position, which gave her an unfair advantage in the interview; the interview panel was stacked against Ms. Faison; the selection process was highly irregular; Ms. Faison was more qualified for the position; and older

employees in CSSD are replaced as a matter of course with younger employees.

Pl.'s Closing Br. at 14-15.

In response, the Court summarizes its findings and conclusions. *See Jones*, 557 F.3d at 679 (the court reviews the evidence to determine if it, separately or in combination, provides sufficient proof for a reasonable jury to infer discrimination). The Court finds that the unanimous recommendation of the interview panel and Ms. Johnson's work background (lead tech, experience in multiple units) provide a legitimate non-discriminatory reason for Ms. Johnson's selection over Ms. Faison. Whether or not the paperwork was properly signed, the evidence that Ms. Johnson was selected and promoted is not really subject to contest. Focusing specifically on Ms. Faison's argument that the District's reasons are unworthy of belief, the Court concludes that there was nothing "illegal" about Ms. Johnson's appointment as Acting Supervisor, especially as older employees were first offered and declined the Acting Supervisor job and the vacancy was unsuccessfully posted in December 2004. There is no evidence to support the accusation that the interview panel was "stacked against Ms. Faison," rather than rationally including senior managers and employees familiar with the work of the Unit. Ms. Faison's argument about an "irregular" selection process is based on factual error and unsupported innuendo. There is no evidence that Ms. Johnson was asked material questions that were not also asked of Ms. Faison and if a follow-up question to Ms. Johnson were prompted by one of her answers, it could not be asked of Ms. Faison, who was the first interviewee. Ms. Faison had more time working in the customer services unit, to be sure, but because Ms. Johnson was already a lead tech in a different unit and had the experience as Acting Supervisor, the Court cannot say that Ms. Faison's credentials were so superior that an inference of age discrimination can be drawn. Finally, the evidence goes every which way on the hiring and promotions of

younger and age-protected employees under Ms. Rice so that Ms. Faison's general charge of age

discrimination does not carry her burden of proof or persuade the Court as fact-finder.

## IV.  CONCLUSION

The Court has combed through Ms. Faison's numerous claims but finds that she

has failed to prove that but for her age, she would have been promoted to the position as

Supervisor of the customer services unit in 2005.  Ms. Faison's theory of violation hinted at a

claim that age was *a* reason for her non-selection, but the Court finds that she has failed to carry

her burden of proof on that theory as well.  Judgment will be entered in favor of the District of

Columbia.  A memorializing Order accompanies this Opinion.


Date:  September 28, 2012                              _____/s/_____
                                                       ROSEMARY M. COLLYER
                                                       United States District Judge